All rise. Hear ye, hear ye, hear ye, this Honorable Appellate Court of the 2nd District is back in session. Pursuant to adjournment, the Honorable Catherine A. Zee offers up the floor. Thank you. Please be seated. Your Honor, it's the fourth case on the morning call, 211-0695. People in the State of Illinois v. Mark R. Mars. On behalf of the Apollonist, Mr. Sean O'Toole. On behalf of the people in the State of Illinois, Ms. Victoria Joseph. Yes. Mr. O'Toole. Good morning, Your Honor. This may please the Court. My name is Sean O'Toole. I'm with the Office of the State Appellate Defender, and I present the Appellant, Mark Mars. I'd like to focus today on the two substantive issues of ineffective assistance of Appellate Counsel. The first focused on whether Tri-Comp or Appellate Counsel was ineffective for failing to challenge the proximate causation of death in this case, where the treating physicians failed to recognize and treat the flesh-eating bacteria that was coursing up the victim's arm at the time of his treatment in the hospital. And second, the failure to challenge the indictments in this case, where they were brought more than two years after the original indictment, despite the fact that they were based on the same facts as the original indictment. Before we get to that, do you want to briefly address the issue of lack of notarization of the affidavit? Yes. The verification affidavit in this case was not notified. The State alleges that is grounds alone for summary dismissal in this case. Clearly, the weight of authority has shifted in this case since this Court's opinion in People v. Carr. Since then, I believe at least five appellate court cases in a row have consistently held that the lack of a notarization on a verification affidavit is, in fact, a procedural defect that is not grounds for summary dismissal. Right. I mean, two of those cases, Henderson and Terry, Henderson in the First District, Terry in the Fourth District. But then you've got Cruz and Turner, both of which involved second-stage proceedings. Correct. So do you feel that those—and Cruz, there was just oral argument the other day in the Supreme Court, but that's a second-stage proceeding. Would the rulings there be relevant to first stage as well? Potentially, only because at the second stage, obviously, what the Court might do in Cruz, I believe, is hold that the fault lies with the post-conviction counsel at that point for failing to amend the petition. And if they do hold that way, I think they might also hold that it's a procedural defect that can be amended at the second stage and, therefore, not grounds for summary dismissal. But I think this Court would be on solid footing even if it decided before Cruz that the lack of a notarization is not grounds for summary dismissal. It's clearly a procedural. It's contained in Section 122-1, not 122-2, which is where the Act contemplates dismissals will occur at the first stage. Thank you. With regard to the proximate causation issue, Mr. Mars asserts that he did not cause the sepsis which killed the patient in this case, Lee Jones. In his petition, he alleges the appellate counsel should have raised an issue about causation, and that states more than an arguable claim of a lack of proximate causation in this case. The appellate counsel should have raised this issue on direct appeal, and that there's more than an arguable case that there's a reasonable probability that a claim would have been successful. Why do you think it would have been successful? I think the record is very clear that the treating physicians in this case were grossly negligent. The state proceeded on a theory of proximate causation. They allege that the cuts in the victim's arm caused by Mr. Mars set in motion a chain of events that led to the victim's death 60 hours after the original crime. And in that case, any reasonable attorney would recognize that in that time period, there's going to be an issue of causation, because Mr. Jones began his treatment at First Hospital where he was not given stitches. He went home for 24 hours. He was in excruciating pain. His arm was swelling. His wife described it as his hand turning black. His arm was turning green and blue and red, as she described it. He refused the stitches at the First Hospital. He refused the stitches. He checked himself out of the Second Hospital, Kenosha Hospital, against medical advice. But going back to your assertion of gross negligence here, the burden shifted, did it not? There was no evidence introduced at all on the part of the defense of any gross negligence at the trial. And wouldn't you have had to introduce, wouldn't defense have had to introduce something? An expert? The law in Illinois with regard to gross negligence is that no expert opinion is needed, because the negligence is so blatant that even a lay person can recognize it. And I think that's the case here. And how would you say that's the case here? How is this like, for example, sponges left inside somebody who's on the operating table? I think it's far worse than that situation, Your Honor. This was a person, a patient who was in the hospital for nine straight hours under the care of physicians who are watching his arm turn black. It's swelling. Dr. Siegel, who treated him for these nine hours, noted that there were cuts in his arm. She knew that that was the original reason for his hospitalization. The medical examiner in this case testified that this is a classic case of necrotizing fasciitis, where there's a slight wound, and yet there's these outsized results associated with the stab wound inflicted by the defendant. So you cite the Peeble v. Stewart in New York case, where the defendant died from a cause solely attributable to the secondary agency, which was the hernia procedure that the doctors on their own decided to perform, which is unrelated to the reason for the initial hospitalization. But since Stewart, the New York Court of Appeals distinguished Stewart in Griffin, a case much more like our case here or your case here, where the stabbing victim died from infection, and applied the traditional causation rule that where a person inflicts upon another a wound that is dangerous, he's responsible regardless of even gross negligence by the surgeons. Well, if that's what the Griffin Court held, if it held that it's regardless of gross negligence, then that law differs from what it went away. Well, it's the same defense that you have here, that there was negligence by the surgeons, that the infection was an intervening cause of death, and the Griffin Court held otherwise, which referred to Stewart, which you cited. Right. Well, it sounds like if they're holding that even gross negligence is not a superseding event in New York, then the case is inapplicable here. We don't need to go to New York. Look at People v. Myers, 392 Illinois, 355 Illinois Supreme Court, People v. Robinson, 199 Illinois Appellate Dirt, 494. I think the law in this state is where there's an act of the accused, the death is presumed to have resulted from the act unless it can be shown that the death was caused by a supervening act disconnected, I think that's the operative phrase, disconnected from any act of the accused. Okay? He goes in there, he's treated, and somehow he falls down the stairs in a hospital or something, has nothing to do with it. I think the argument, and I think it has a lot of intuitive and logical appeal, is the sepsis entered, the flesh-eating bacteria entered to the wound that was inflicted by the defendant. Right. So can we honestly say he died from a cause that was unconnected to any of the defendant's acts? One, if he didn't have a cut, he didn't have an open wound, arguably he wouldn't have got the infection and killed him. But aside from the language about being disconnected, I think this Court's looking at the language a little too literally, given that gross medical negligence is considered a superseding event. Fair to recognize and treat is an intervening event? In this case, yes. Well, first of all, there's a difference between the necrotizing fasciitis, which entered his arm, and the sepsis which killed him. The sepsis was an infection of the bloodstream. One did cause the other. That's true. But what's also true is that the failure by the doctors also caused the sepsis because, as the ME testified, if they had gotten to that arm sooner, there would have been no sepsis. And you're saying a layman, an average layman, would have known this, would have known about necrotizing fasciitis? I think it's arguable, which is what we're at the first stage here, remember. So it's arguable that a layperson looking at this record would say the patient's arm is turning black. When he's checked in, he has cuts, and it's blue and red and green. The doctor recognized those cuts were there. He's delirious with pain. He's ripping off his heart leads. He's knocking over samples. He's pulling out IVs. He was diagnosed with being in a state of diabetes. Right. Diabetic, almost diabetic shock, I would think. No question this patient had whatever you name it, he had it. But there was no testimony that was inconsistent for them to treat the diabetes, that it was mutually exclusive for them to treat the necrotizing fasciitis. And one point I'd like to make, he checked himself out because they would not treat his arm. Excuse me, what evidence is there of that in the record? He was found, after leaving Kenosha Medical Center, he was found on his front steps by his wife, who testified that he exclaimed to her when she found him laying on his front steps, they wouldn't treat my arm, they wouldn't take care of my arm, and that was the reason why he left. And the flip side of this is the treatment that these doctors didn't feel was appropriate, and that's x-rays to see if it was broken, ice and elevation. The difference between what was needed here, which is antibiotics and surgical removal of the infected area. If your argument were correct, then any time that there was some medical negligence in any case that would open the door for that type of defense. And how do you counter this argument that the language from our cases, language from People vs. Stamps, where a person inflicts upon another a wound which is dangerous, that is calculated to endanger or destroy life, it is no defense to a charge of homicide that the alleged victim's death was contributed to by or immediately resulted from unskilled or improper treatment of the wound or injury by attending physicians or surgery. That's People vs. Stamps. That's the cutoff here. How do you counter that argument? That's the cutoff here. I have no qualms with that statement of law. The difference is improper and skillful medical treatment is distinct from grossly negligent medical treatment. Do you have any cases that say that, again, where the cause of death... So you're saying gross medical negligence means that the act of the defendant is disconnected from the death. How is it disconnected? Well, I'm saying that the way they mean disconnected is that there's a superseding event that was unforeseeable. Remember, this is a case about proximate cause. The state has the burden of proving proximate cause. So one of the ways the defendant can gain approval is to show that the state failed to prove proximate cause. And to show proximate cause, you have to show foreseeability. And what the courts have been clear on since Brackett and more recently in Gulliford is that gross medical negligence is, in fact, unforeseeable. Now, it's true. In Illinois, unfortunately, we don't have a case where the medical treatment was deemed to be so grossly negligent. So it constitutes a superseding event. But clearly the Brackett court and the Gulliford court and the Robinson case you cited do contemplate the availability of that defense. And I think it's arguable that that defense is superseding. Superseding event. If they would have said we're not going to treat you at all, what's the superseding event? The wound was the proximate cause of the demise of this individual. Well, and I think it's arguable that the failure to diagnose and treat the wound for a patient who's sitting in that hospital nine hours with these types of symptoms is, in fact, a superseding cause because it's so beyond what an ordinary person would expect the standard of care to be. Now, defendant's trial theory, though, wasn't at all, didn't have anything to do with the gross negligence. It really appeared more to be that the victim's other medical ills and ailments really were the cause of his demise, correct? Correct. And unfortunately, as we've been debating here, that's not a defense in Illinois because if you set in motion a chain of events and it's just improper medical treatment, or even if it's something the victim does, that he leaves the hospital, like what happened at the first treating phase here, actually the first two, or that he refuses medical treatment, then that's what the law says in Illinois. But the law at the same time says once the doctors get involved, they can become an intervening, superseding cause of death. And I think that's arguable. Now, when he went to Kenosha Hospital, though, he didn't tell them he'd been stabbed. He told them that he'd been hit, and so they didn't have that information, correct? At the first hospital, they saw the cuts and they cleaned them. I believe they gave him antibiotics at that point, but not at the second hospital. He didn't tell them that, so they applied the ice to the swelling. They gave him some pain medication, and then, of course, they treated the diabetic situation. If that's, in fact, true that he did not tell them, then I think that's what one of the doctors testified to. She also testified that he was brought in and his arm was examined at the outset of his arrival at Kenosha. So they knew there was a problem with the arm. And Dr. Siegel specifically testified she saw the cuts in the arm. So we know that they could have put two and two together here very easily. They should have put two and two together. Cuts in the arm, swelling, discoloration, excruciating pain, spreading of the arm during the 9 hours he's there. To the extent where he's acting delirious, I think it's grossly negligent not for them to have treated this with ice and elevation. And it's not indisputable. It was negligent of them just to have treated that. I'm sorry, just to have treated that with ice and elevation. And certainly, I don't think this court can say that it's indisputably meritless to argue that appellate counsel had a reasonable probability of success in this argument. I'd like to move on to the second argument, if this court has no other questions regarding proximate cause. And that's counsel's failure to challenge the indictments here. The state does not contest the substantive merits of this claim. Clearly, these were new and additional charges. Clearly, they are brought beyond the speedy trial deadline of 120 days. So had the defense been successful, these charges would have been stricken. He was only convicted of count three, which was brought two years after the original indictment. So the only question that the state raises is whether this claim was in fact contained in the petition. And I think if you look at the language Mr. Mars used in his petition and apply the proper standards under Hodges for the gist of a constitutional claim, then this is clearly beyond the borderline type case that this court should let find raises as a constitutional claim in this case. When Mr. Mars wanted to refer to appellate counsel, he did. Yet he also used the words defense counsel. And I think in a context, especially with regard to this particular issue, that seemed to indicate that he was talking about trial counsel as opposed to appellate counsel. I'm sorry. Well, the second sentence, this is contained in the same paragraph. The first sentence says defense counsel failed to challenge the sufficiency of the grand jury indictment, which omitted essential elements of the charges. Of course, nothing about joinder or speedy trial, obviously. And then in the same paragraph, he says, but for counsel's ineffective assistance of counsel's no trier of fact could have found petitioner guilty beyond any reasonable doubt of first-degree murder. We're still talking about the trial level here. So I think certainly, if nothing else, from the context of what's written. Well, I think this court, if it reads the petition, it's written pro se by a lay person. The standard is whether there's sufficient facts in the petition. Defendant does not even have to make legal arguments. He doesn't need to raise legal issues, cite legal authority. True, but even on liberal reading, we're talking about who he's referring to here. But if you look at it in context, he doesn't use the word trial counsel. Now, he does use reasonable doubt. But reasonable doubt is also an argument you can raise on direct appeal. So if you're looking at this through the liberal construction and realizing that, A, trial counsel did challenge the indictment at trial. There was extensive hearing on this. So it would make little sense for him to be re-raising this as a form of trial error. And second, by virtue of the fact that it was raised and litigated so extensively below, one would expect that it be raised on direct appeal, especially where the claim is as strong as it was here. It wasn't just litigated below. The trial court actually ruled in defendant's favor at first. He changed his mind later. But when there's a ruling below where trial counsel rules in defendant's favor and changes his mind, it is unreasonable for appellate counsel not to raise that issue on appeal. And if you look at that, and if you take this context into the reading of the petition, I think that a liberal construction with a lenient eye, as Hodges requires this court to read the petition with, and let borderline cases in defendant's favor go through to the second stage, then I think a liberal reading allows for this court to find that this is a claim of ineffective assistance of appellate counsel. Particularly, he does not use the word trial counsel. If you look at Hodges itself, the defendant in that case achieved remand for an ineffective assistance of counsel claim that he did not even raise in his petition. He raised only a claim of ineffective assistance of counsel for failure to investigate self-defense. And what the court said was there's not a just of a self, or there's not an arguable self-defense claim here. So what the court then did was look at the facts alleged in the petition. And it found there was sufficient facts for a second-degree murder, a second-degree murder defense. And that's the allegation that the court remanded for second-stage proceedings. The second-degree murder was never mentioned in the petition in Hodges. And I think the same application of the liberal construction applies here, which is that, yes, Mr. Mars did not mention the words compulsory rejoinder. That's clearly a term of art. I don't think he's expected to raise that issue by its name. But he did allege that there was insufficient facts, that the insufficient facts contained in the original indictment. And if he's arguing a compulsory rejoinder claim as a layperson, I think that's how he would express it. The original indictment had the aggravated robbery charge, but it did not have attempt robbery, attempt aggravated robbery. And those were the facts under which, actually only the attempt robbery were the facts under which he was convicted. Those would be included offenses anyway, wouldn't they? They are lesser included because they're attempt. But the case law on compulsory rejoinder does not seem to distinguish between charges that were included and charges that are new and additional. Well, the state is entitled to a lesser included instruction based upon the facts that are presented at the time. For example, if a defendant is charged with intentional or knowing murder, and the evidence shows that the defendant was guilty of a felony murder, or there's evidence of a felony, then the state's entitled to a felony murder instruction, despite the fact that they didn't allege it in the indictment, correct? Correct. But at the same time, if this court looks at Williams and Isquierdo Flores, then I believe that the, especially if Williams was a second degree murder charge followed by a first degree murder charge, the court held that that was a new and additional charge, even though it contained the same elements. So, for compulsory rejoinder purposes, the point is to prevent the state from harassing a defendant with later and additional charges, not necessarily to provide notice, which the defendant would have had, but to prevent the infinite double jeopardy, et cetera. Correct. So I think that's why it doesn't matter that these are lesser included offenses. Counsel, you'll have additional time on rebuttal. Thank you. Ms. Joseph. Good morning, Your Honors. Victoria Joseph for the state of Illinois. May it please the court and counsel. The people would first like to address the notarized verification issue. Unlike the defendant who claims that this is simply a procedural issue, the people assert that this is distinct from the timeliness issue that would have been brought up in Wright or Beauclair that is discussing timeliness as a procedural issue and cannot be dismissed at the first stage. Unlike timeliness, which would be equivalent to a statute of limitations claim, it is not inherent in the right to bring a postconviction petition. However, the notarized verification is an inherent element in the right to bring this action. The notarized verification is a statutorily constructed remedy or process for the defendant, and therefore it should be narrowly construed, and that is a requirement in order to convince the action he did not bring it. The purpose of having this notarized verification is to hold people to a standard of truth, and it makes them subject to the legal consequences of what they raise in their petition. So when they're bringing in claims that are outside the record, without the verification, a notarized verification, somebody can assert anything that happens, regardless of whether it happened or not, just to acquire second-stage proceedings. Counsel, what about the Turner case decided by this court? Doesn't Turner sort of behave impediment to your argument? Well, the people would assert, as it is pending in the Supreme Court right now on a petition for leave to appeal, that that was incorrectly decided. Also, it is a second stage. It is a different consideration in that they're equating that counsel was ineffective for not making sure it was verified. However, the people still assert that because here you're looking at well-pleaded facts in a defendant's petition without having a notarized verification to establish the veracity of those facts, that they cannot be taken as true and that you cannot have a claim that is arguable. I'm sorry, arguable in fact, without having that veracity there. But now, didn't you argue as well, at least in your brief, or saying that defendant, because there was no notarized affidavit, didn't really even commence a post-conviction proceeding here? Yes. And wouldn't that really be equivalent to saying that notarization is, or lack of notarization is a jurisdictional defect? And if so, what authority would there be for that? I'm sorry, what authority would there be for it being a jurisdictional defect? Right. Isn't that the equivalent if you're saying that there's no proceeding that's been commenced at all, if you don't have a notarized affidavit? Well, it would be like bringing a complaint about someone that's incomplete. It could not proceed. So it would not have, until it is complete and here, part of the inherent element in bringing that action is verifying by affidavit. And where it is not verified by affidavit, the people do assert it has not commenced. So the cause of action would not be able to proceed further. Which sounds like a jurisdictional argument, doesn't it? Yes, Your Honor, it is. The court can't entertain it. The question is why. What about the idea that there was a superseding, intervening, independent cause of death of the victim? Your Honor, the people assert that there was no independent, superseding cause of death to the victim. The victim was stabbed in the arm during an attempted robbery. The necrotizing fasciitis was caused from the break in his skin and he developed necrotizing fasciitis, which led to the sepsis. He also had a slew of other medical maladies that he came with. When he went to the hospital, the first hospital, he was treated with ointment. They wanted to do more, but the defendant, I believe the evidence was the defendant said he was scared and wanted to leave, so he left. Comes to the second hospital, he comes in, they were immediately concerned with his diabetic condition and started treatment for that. The examiner may have testified that this is a classic case of necrotizing fasciitis, but the medical examiner also recognized that he had all of these other medical conditions that were of concern. And while I'm not sure where in the record the medical examiner commented that it would have prevented the sepsis had they found it sooner, however, the medical examiner did not opine that anything the doctors did was negligent in this case. The defendant was inflicted by a dangerous wound, I'm sorry, the victim was inflicted by a dangerous wound by the defendant, and the defendant is still responsible despite any unskillful or improper treatment because that is reasonably foreseeable. When you say any improper treatment, you're including what the defense argued, medical negligence is not excused. It would be only when, I believe in Guilford, which would be 86 Illinois Appellate 3rd, 237 at page 241, it says, however, where the medical treatment is so bad as to constitute gross negligence or intentional malpractice, such gross or intentional medical maltreatment constitutes a valid defense because the intervening conduct is abnormal and not reasonably foreseeable. So gross negligence would be a valid defense. It would be a valid defense, however, there is nothing in the record to suggest that there was gross medical negligence in this case. What about his argument that basically they failed to recognize and treat it? Is a failure of effective treatment or any treatment gross negligence? No, Your Honor, because going on to page 242 in Guilford, it says, the attending physicians and the family of the victim owe no duty to the defendant to treat the victim so as to mitigate the defendant's criminal liability. So here, the doctors are treating for what they find is the most, I don't remember the language they used, but the most important factor when he comes in, the biggest concern when he was brought in was the diabetes, getting his potassium levels and his insulin levels down. The fact that they were not able to get to the necrotizing fasciitis doesn't break the defendant's criminal liability. So you're saying gross medical negligence would mean they quote-unquote did something wrong as opposed to not doing anything? So, I believe... Well, they also did treat his arm. They treated his arm. They did. As much as they had available to them and the knowledge available to them at the time. When he was in the second hospital, I believe, as you said, he initially presented, his initial complaint was arm pain, and that was on page 810 of the record. And then they noticed all these other problems with him and started treatment. They gave him the x-rays. At that point, I believe they said that there were no surface injuries needing treatment at that point. They x-rayed him. They were trying to do as much as they could with the information that they had available to them. The victim, however, was uncooperative and then left against medical advice. We can only speculate that they would have found it had he stayed. But that's completely speculative, Your Honor. But there's nothing in the record to suggest that what they were doing was an independent or superseding cause that's breaking the defendant's criminal liability in this case. And I believe... I don't remember which of you asked would an average layman know that this was gross medical negligence. I know everyone had to Google necrotizing fasciitis when I originally got this case three or four years ago because I had no idea what it was or what it did. It's not bad that you didn't know what it was. And would you know what the symptoms would be, how it would present? No, not without looking it up. When it's just presented to me as... I mean, it's a Latin term to begin with, so I would have had to break it down and guess what it was. But as a layman, as an average reasonable juror, knowing anything about it and even, I'd say, an immediate treatment by doctors, would it be something you could recognize on the surface of the defendant's body? Probably not. However, I'm not a medical expert. I can't testify to that. But I do not believe, Your Honor, that this would be something that an average reasonable person would recognize, the problems associated with necrotizing fasciitis and whether there would be gross negligence involved. May I continue to the third issue? Your Honors, when we're considering... is whether the post-conviction judge, based on the defendant's pro se conviction, was able to find an arguable claim of fact or law. Here, the defendant's specific claim was, defense counsel failed to challenge the sufficiency of the grand jury indictment, which omitted essential elements of the charges, but for counsel's ineffective assistance of counsels, no trial or fact could have found petitioner guilty beyond any reasonable doubt of first-degree murder. The people assert that this is not a borderline case, Your Honor. Essentially, what the defendant is requiring here, that even a liberal reading of this could not get to a speedy trial or compulsory joinder. It would essentially be requiring the post-conviction judge to scour the record and advocate for the defendant to determine that that's actually what he was alleging in his post-conviction petition. And the defense counsel brought up that this was heavily litigated below. The defendant, I believe, was in attendance when all of this was litigated. So even if he had used non-legal terms, he would have been very aware of what this claim was. So the fact that he has no factual detail regarding a compulsory joinder or speedy trial claim, the trial judge did not improperly rule that the defendant failed to substantiate his claim or provide any details of a constitutional violation. There was just nothing there by which the post-conviction judge could determine that was the issue. So that is – are there any other questions? Thank you, Your Honor. Thank you, Your Honors. Mr. O'Toole? Your Honors, with regard to the notarization requirement, counsel points out the fact that this requirement is contained in the statute, Section 1 of the statute, where it talks about what is needed to bring forth a claim. And I think that distinction is key because what the Carr Court did was rely on Delton. And Delton talked about dismissing for lack of affidavits that are required under Section 122-2. And Section 120-2-2 deals specifically with summary dismissals. So the distinction between the notarization of the verifying affidavit, which is required under Section 122-1 in this case, versus the substantive affidavits, which are actually in the summary dismissal portion of the statute, is key. And it's clear that – we know from Beauclair the timeliness, which is also contained in Section 1, 122-1, like the verification requirement, is procedural. And so all of those in subsection 1 are procedural. It happens you agree with Turner, do you not? Correct. And Turner, I think, states very clearly why. So with regard to the proximate causation, counsel says the first thing that the second hospital did was focus on the diabetes. That's not true, Your Honor. Dr. Siegel testified that the nurse immediately took notice of the defendant's arm and focused on the arm. So it scratches there. There was no stab wound identified in the record. Correct. And we know from Dami's testimony that necrotizing fasciitis can enter through, he said, a pinprick. And we know that these were small abrasions, but certainly sufficient to contract necrotizing fasciitis. And I think when the state argues that they did everything they can with what they knew, that ignores the whole slew of manifestations of this disease that were staring these doctors in the face, including the discoloration, the bloatedness, the swelling, and the obvious pain, excruciating pain this patient was in. It just makes no sense for these doctors to disregard that. As far as whether a layperson would know, I think those symptoms are something any person could know. Whether or not you know it's necrotizing fasciitis, you know that there's something more wrong with that arm than a break or something that requires ice and elevation, which is the only treatment they gave, which was woefully insufficient for what this required. Any person knows that when you get a cut, you put on the S4 and you put on antibiotics because of the fact that we know, any person knows, infections can enter the bloodstream or the skin through cuts. So I don't think it took, you know, whether I could have told you before this case what necrotizing fasciitis is. The question is whether someone listening to this testimony, hearing about necrotizing fasciitis, hearing about its manifestation in this patient, hearing about what these doctors did, could come to the conclusion that these doctors were so grossly negligent that they constituted a superseding event. And particularly at the first stage, again, Your Honor, all we're asking is for a chance to hone the claim. As the act contemplates, assistance of counsel at the second stage will allow him perhaps to introduce expert testimony about gross medical negligence if it's in fact the case. And at that point is when this issue should be decided. And I'll leave it at that, Your Honor. I just ask for a remand for second stage proceedings. Thank you. At this time, the court thanks counsel. We'll take the matter under advisement and render a decision in due course. And we're adjourned until the next case. Thank you.